383 So.2d 1231 (1979)
Granville Ray CLEETON
v.
Sonja Petersen CLEETON.
No. 64649.
Supreme Court of Louisiana.
December 13, 1979.
On Rehearing May 19, 1980.
Philip P. Spencer, New Orleans, for plaintiff-applicant.
Wendell E. Tanner, Slidell, for defendant-respondent.
SUMMERS, Chief Justice.[*]
Granville Ray Cleeton and Sonja Petersen Cleeton were married at Mexico, Missouri, on July 4, 1961. Three daughters were born of this marriage, who in March 1978 were 15, 10 and 7 years of age. On May 22, 1976 the parties separated. Neither sued for a separation from bed and board, the husband moving to St. Bernard Parish and the wife and children remaining in the house belonging to the community in Slidell, St. Tammany Parish.
Thereafter the estranged couple sold the Slidell house occupied by the wife and children, and the wife and children occupied a rented apartment while the husband continued to reside in St. Bernard Parish where he was employed as manager of a variety department store.
In late November 1976, about six months after her separation, Mrs. Cleeton met Dave Breedlove, a married man living apart from his wife and children, whom he visited once a year at Christmas time. They began to see each other regularly. From at least November 1977 until the beginning of April 1978, Mrs. Cleeton and Breedlove spent at least one night together each week in Mrs. Cleeton's apartment with the children present. In addition, at times they were away together on weekends while the children visited their father. During one Mardi Gras season Breedlove spent at least four or five days with Mrs. Cleeton and the children. He left clothes and toilet articles at the apartment and was regularly there when their father arrived to take the children for weekends and other visitations *1232 with him. On one such occasion Mr. Cleeton observed Breedlove asleep in Mrs. Cleeton's bedroom.
From time to time Breedlove ate with Mrs. Cleeton and the children, bringing food and presents to them. They were often together in public places.
Breedlove's open association with Mrs. Cleeton and her children did not cease until suit demanding a change of child custody was filed against her by her husband. Furthermore, it is significant to note that Mrs. Cleeton found nothing wrong with this arrangement.
At the hearing Mr. Cleeton established that he had been regularly employed for 27 years, earned $31,000 per annum and was able to provide a home for the children under proper care and supervision should he be awarded their custody. His testimony was without contradiction and was, in fact, conceded by Mrs. Cleeton. The only testimony militating against Mr. Cleeton's claim for custody was the self-serving statement of Mrs. Cleeton that the children wanted to stay with her.
At the conclusion of the hearing the trial judge dismissed Mr. Cleeton's rule for custody and granted custody to Mrs. Cleeton. The same evidence, by stipulation, was considered by the judge in rendering a judgment of divorce in favor of Mr. Cleeton.
In deciding that Mrs. Cleeton should have custody of the children, the trial judge considered in this "close case" that Mrs. Cleeton was providing a good home and was caring for and educating her daughters. "The only thing that's wrong with her lifestyle is that, whether some of the more progressive people care to admit it or not, there are moral principles accepted by our society and they are at present against any lifestyle that would, as I understand the law, allow a woman to live with a man in open concubinage."
He then proceeded to find that Mr. Cleeton could very quickly provide a very good home for the children and a proper environment for their upbringing. Finding that the relationship between Breedlove and Mrs. Cleeton could not long continue without having some adverse effect on the children "for the rest of their lives," he nevertheless decided that the state of open concubinage in which Mrs. Cleeton had lived for at least six months did not outweigh the other favorable factors involved in Mrs. Cleeton's relationship with her children.
In conclusion the trial judge admonished Mrs. Cleeton that if her lifestyle with Breedlove continued the question of the children's welfare would be brought before the court in his capacity as Juvenile Judge, and he would declare them wards of the court, inferentially indicating that she would be deprived of their custody. As we understand his decision, the trial judge was of the opinion that the adverse effects on children involved in such a relationship had not yet influenced the Cleeton girls.
On appeal the First Circuit, in a unanimous opinion, reversed the decree of custody and awarded custody to the father. The case was then remanded to the trial court to fix the visitation rights of Mrs. Cleeton. 369 So.2d 1072. The Court of Appeal restated long prevailing principles which ordain that in matters of child custody trial courts are vested with considerable discretion; the mother is preferred as custodian of children of tender years, unless she is unfit and her conduct affects the children adversely; the paramount consideration is the welfare of the children; decisions must be based upon the particular facts and circumstances of each case; moral values of parents are likely to be reflected in their children when they become adults; and a heavy burden is imposed upon the party seeking to change custody to establish, not only that the present circumstances are harmful to the physical or moral welfare of the children, it must be shown that a better and more wholesome atmosphere can be provided. 369 So.2d 1075.
On these principles the Court of Appeal declared it had no hesitance in concluding that Mrs. Cleeton's conduct could not provide the wholesome atmosphere her children were entitled to. She made no effort, the Court found, to conceal her illicit relationship *1233 with Breedlove until her husband sued for divorce and custody of the children. According to the Court of Appeal, Mrs. Cleeton permitted Breedlove to stand in loco parentis with her children, conferring upon him regular access to their home, permitting him the privilege of intimate relations with their mother, and otherwise accepting him as a member of the family unit.
The court likened the case to Morris v. Morris, 152 So.2d 291 (La.App.1963) where the trial court granted the husband a divorce on the ground of adultery but awarded the wife custody of the minor children. In Morris this same circuit held that the trial court erred in granting the wife custody of the children where the evidence indicated that the wife was guilty of a calculated, continuous course of misconduct of such an open and public nature involving intimate relations with a married man as to render her unsuitable as custodian of her children.
In the instant case the burden imposed upon the husband to establish that the mother was guilty of immoral and illicit conduct is satisfied by the sworn testimony of Mrs. Cleeton. It is therefore unnecessary to dwell on that phase of the case. The issue is whether the mother's illicit, immoral and notoriously public conduct was such that it affected these children of tender and formative years adversely.
Apparently exposure of the children to their mother's illicit, adulterous arrangement with Breedlove did not impair their accomplishments in school. Their progress there was both commendable and above average. In other respects, the mother's testimony and the testimony of others support a finding that the children were happy, healthy and well-behaved. It remains therefore, to determine whether the mother's conduct and indiscretions were such that her example would otherwise adversely affect the children.
The effect of conduct of this nature instilled in the hearts and minds of children of tender years by their mother cannot manifest itself until they attain a stage in life where their physical state permits, and they are called upon to decide, what their own standards of conduct will be. And if we accept, as we do, the premise that an open and notorious adulterous relationship by the mother of children of tender years will influence those children in later life to consider such conduct acceptable, we must then decide the effect in law of that standard.
Adultery on the part of one of the spouses is a cause for the other to claim an immediate divorce. La.Civil Code art. 139. While it was, at the time of this liaison, a principle of the Civil Code that the custody of the children be awarded to the spouse in whose favor the decree of divorce was granted, it is now prescribed that custody shall be awarded to the husband or wife in accordance with the best interest of the child. La.Civil Code art. 157.
Adultery of the mother, especially when it is open and public for a substantial period of time, in total disregard of the moral principles of society, has repeatedly been held to establish that the mother is morally unfit to maintain custody of her children. La.Civil Code art. 157; Beck v. Beck, 341 So.2d 580 (La.App.1977); Fontenot v. Fontenot, 315 So.2d 830 (La.App.1975); Kaufman v. Kaufman, 271 So.2d 629 (La.App. 1972); Johnson v. Johnson, 268 So.2d 114 (La.App.1972).
Obviously both the Code and numerous decisions of the courts of this State have recognized that adultery is immoral and contrary to acceptable standards of conduct in our society. The trial judge recognized this, and the Court of Appeal did also.
We think the trial judge erred, however, when he decided that the mother's six-month arrangement with her paramour had not yet had an adverse effect upon these young girls. This decision in what he termed a "close case" was apparently based upon the testimony of Mrs. Cleeton elicited by the judge at the hearing. She testified that her bedroom was in the lower level of a split-level apartment, and the children slept on the upper level bedrooms. We think it is unrealistic to conclude from this *1234 testimony that the fifteen and ten-year old girls were not aware of the fact that Mrs. Cleeton and her paramour engaged in sexual intercourse while they slept together. Nor is it realistic to conclude that Breedlove's repeated presence in their mother's company did not influence these children adversely and to their detriment, especially the fifteen-year-old.
It was the duty and responsibility of the father of these children to file suit to obtain their custody and remove them from the immoral atmosphere created by the illicit adulterous arrangement of the wife and her paramour. This Court's decision in Fulco v. Fulco, 259 La. 1122, 254 So.2d 603 (1971), relied upon by Mrs. Cleeton, is factually distinguishable from the case at bar, although that case does recognize that the mother's right to custody should be denied where she is morally unfit, or where she engages in a calculated and continued public course of immoral conduct. That is the distinction to be drawn here. In Fulco the evidence was that the mother's consort frequently spent late evenings at her home and at least once spent the night with her; and on at least two occasions they spent weekends together out of town. This conduct is, of course, entirely different from Mrs. Cleeton's lengthy arrangement with her lover as the facts already set forth demonstrate. Mrs. Cleeton's arrangement was not a casual affair, it was such as this Court reprobated in Fulco: a situation in which she engaged in a calculated and continued public course of immoral conduct.
For the reasons assigned, the judgment of the Court of Appeal is affirmed.
DIXON and CALOGERO, JJ., dissent.
DENNIS, J., dissents with reasons.
DENNIS, Justice, dissenting.
I respectfully dissent.
I do not find this case legally distinguishable from Fulco v. Fulco, 259 La. 1122, 254 So.2d 603 (1971). In Fulco the husband and wife were judicially separated on June 18, 1969. Sometime during that month, the wife, who had custody of the children, met a local dentist who was married at the time and they began going out. The evidence showed that the affair continued on through the dentist's separation from his wife in December, 1969, and in fact was continuing through the trial on the custody change. The trial judge found that the wife at the time the rule to change custody was filed in August, 1970, had moved in with her parents. Although the wife's conduct might have furnished grounds for a change of custody on July 24, 1970, the judge felt that since that date the wife did not commit illicit acts to the detriment of her children. Considering that the environment which the wife furnished for her children was excellent, the trial judge denied the change of custody. On review of the court of appeal reversal of the trial judge, we stated:
"* * * [W]e are unable to hold that the trial judge erred in continuing custody in the mother, subject to her continued reformation from any previous course of open indiscretion and probable immorality. These young children have been with their mother since they were born. There is no showing that the mother was not providing a good and moral home for them at the time of custody hearing below, nor that any conduct on her part is having any adverse effect upon their welfare. The purpose of a custody determination is not to punish a parent for any past misconduct, it is rather to serve the best interests of the children of the marriage."
In this case, the wife testified at the hearing that she had stopped seeing Breedlove shortly after the husband filed his rule to change custody. The evidence demonstrated that the prior illicit arrangement between Mrs. Cleeton and Mr. Breedlove had had no effect on the children. As the majority states, "the mother's testimony and the testimony of others support a finding that the children were happy, healthy and well-behaved."
The majority focuses on the long-range detrimental effects upon the children of a continuation of the relationship between *1235 Mrs. Cleeton and Mr. Breedlove. Be that as it may, the fact remains that Mrs. Cleeton testified without contradiction that her affair with Breedlove had ceased at the time the rule was filed. This should be enough to sustain the trial judge's decision to leave custody with the wife until the husband makes a showing that the present atmosphere of the wife's household is detrimental to the best interests of the children. The purpose of a custody determination is not to punish a parent for misdeeds but to promote the children's welfare.

ON REHEARING
WATSON, Justice.[*]
This is a custody contest in which a rehearing was granted to reconsider the question of whether the welfare of three minor girls would be best served by a change of custody from their mother to their father.
Plaintiff, Granville Ray Cleeton, and defendant, Sonja Petersen Cleeton, were married at Mexico, Missouri, on July 4, 1961, and separated on May 22, 1976. The three daughters born of the marriage are now seventeen, twelve and nine years of age. The trier of fact decided that they should remain with their mother. The trial court noted that the mother's relationship with Dave Breedlove had not adversely affected the children at the time of trial and that she had discontinued her open association with him.
The Court of Appeal, First Circuit, reversed the judgment of the trial court. Cleeton v. Cleeton, 369 So.2d 1072 (La.1979). The appellate court found that the mother was morally unfit and that the father could provide a better moral atmosphere. A writ was granted to review the judgment of the Court of Appeal, 373 So.2d 522 (La.1979), and this court originally affirmed that judgment.
The prior opinion of this court over-looked several important particulars:
First, the original opinion, as well as the Court of Appeal, failed to give adequate weight to the trial judge's determination. The inferential effect of the decision is that such determinations will be reversed for error. See the Court of Appeal opinion at 369 So.2d 1074 which uses the "manifest error" test. The better standard of review in custody matters gives trial court decisions great weight, to be overturned only when there is a clear abuse of discretion. Fulco v. Fulco, 259 La. 1122, 254 So.2d 603 (1971).
The prior opinion erroneously described the relationship between Sonja Cleeton and Dave Breedlove as "concubinage". Concubinage is a "cohabitation of persons not legally married". Webster's Third New International Dictionary, 1976 Edition, at page 472. The word implies a permanent living arrangement similar to that between man and wife and implies a "kept woman" element. The evidence here is that Dave Breedlove occasionally stayed overnight with Sonja Cleeton, but maintained a separate residence. He did not support her. According to Sonja Cleeton's testimony, the relationship was discreet. The girls slept in second floor bedrooms, and she had a first floor bedroom. When Breedlove remained overnight, he generally departed before her daughters awakened. While adulterous, the relationship was not one of "concubinage". Mrs. Cleeton met Dave Breedlove after she had been separated from her husband for six months. Her marriage had terminated in fact although not in law.
The most important factor to the trier of fact was insufficiently considered on original hearing. These children are "accustomed" (Tr. 179) to their mother's care. Her nurturing has resulted in happy, healthy, well-behaved, scholastically successful children. According to Sonja Cleeton's testimony, their hard working father had little time for them prior to the separation. He now has regular visitation rights but his long hours of employment do not allow him to be a house husband. Their *1236 nonworking mother has had their day to day care. It would be traumatic to change a situation of many years standing. The father's custody, although not detrimental, would be a substantial change in the children's lives.
To change the custody of these girls would punish their mother for past behavior when there is no proof of a detrimental effect on her daughters. An award of custody is not a tool to regulate human behavior. The only object is the best interest of the child. LSA-C.C. art. 157. The trial court correctly decided in favor of stability, noted that the children have prospered, and gave custody to the parent most intimately involved with their care. We now hold that there was no abuse of discretion by the trial court and that our original opinion was incorrect.
For the foregoing reasons, the judgment of the Court of Appeal, First Circuit, is reversed; the prior opinion of this court is vacated; and, the judgment of the trial court is reinstated.
REVERSED AND RENDERED.
DENNIS, J., concurs with reasons.
BLANCHE, J., dissents.
MARCUS, J., dissents, adhering to original opinion.
DENNIS, Justice, concurring.
I respectfully concur in the majority opinion. This court should clearly reaffirm its holding in Fulco v. Fulco, 259 La. 1122, 254 So.2d 603 (1971). The result reached by the majority is correct under Fulco, however, because the evidence supports findings that the mother had repented in her course of open indiscretion and that the best interests of the children would be served by their remaining in her custody.
NOTES
[*] Judge Patrick M. Schott participated in this decision as Associate Justice ad hoc.
[*] Honorable Frederick Stephen Ellis participated in this decision as Associate Justice Ad Hoc.